UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ADMIRAL METALS SERVICENTER CO., INC.,<br>　　　　Plaintiff,<br><br>　　　　v.<br><br>FEUZ MANUFACTURING, INC. and GARY A. FEUZ, individually,<br>　　　　Defendants,<br><br>　　　　v.<br><br>GENERAL ELECTRIC COMPANY and EMPIRE RECYCLING OPERATIONS, INC.,<br>　　　　Reach and Apply Defendants. | CIVIL ACTION<br>NO.:　04 12204 JLT |

## **DEFENDANTS AMENDED COUNTERCLAIM & JURY DEMAND**

　　1.　　Plaintiff-in-counterclaim is Feuz Manufacturing, Inc. ("FMI"), a New York corporation, whose principal place of business is located at 679 Mariaville Road, Schenectady, NY.

　　2.　　Plaintiff-in-counterclaim is Gary A. Feuz ("Feuz"), a resident of the State of New York whose address is 898 Currybush Road, Schenectady, NY.

　　3.　　Defendant-in-counterclaim is Admiral Metals Servicenter Company, Incorporated ("Admiral"), a Massachusetts corporation, whose principal place of business is located at 11 Forbes Road, Woburn, MA.

　　4.　　FMI placed an order to and purchased from Admiral oxygen-free copper under purchase order number B1806 which was delivered to FMI in two half deliveries on June 16, 2003, and June 26, 2003.

　　5.　　FMI placed an order to and purchased from Admiral oxygen-free copper under purchase order number B2337 which was delivered to FMI on September 19, 2003.

6. Admiral certified each delivery of copper, under purchase order numbers B1806 and B2337, to FMI as being oxygen-free.

7. Admiral provided written documentation to FMI that the copper was oxygen-free.

8. Admiral knew or should have known, from communications with and its past supply of materials to FMI, that FMI was in the business of manufacturing precision parts for turbines and, therefore, it was essential that the copper purchased by FMI be oxygen-free.

9. Relying on Admiral's certification, FMI used the copper to manufacture stator bar clips and leaf packs that were to be ultimately used by General Electric ("GE") in generator re-buildings.

10. After FMI manufactured the stator bar clips and leaf packs, it sent the products to HTG Cincinnati ("HTG"), located in Cincinnati, OH to be brazed and installed into a re-built generator.

11. After the stator bar clips and leaf packs were brazed together, a GE field engineer inspected the parts before installing them into a generator and determined that the leafs or fins were cracked and thereafter broke off.

12. On September 19, 2003, HTG notified FMI of the findings of the GE field engineers.

13. Representatives of FMI immediately contacted the GE field engineers to ascertain the nature and cause of the failure and were advised that the copper was not oxygen-free and therefore defective.

14. The fact that the copper was not oxygen-free was further supported by testing performed at an independent laboratory which found that the copper's oxygen content was far out of tolerance for oxygen-free copper.

15. Once FMI learned of the defective copper it immediately placed Admiral on notice as to the defective nature of the copper, advised Admiral of its efforts to rectify the supply and manufacture of the replacement parts, and FMI detailed the damages it incurred as a result of being supplied the defective copper.

16. Upon learning of the defective copper, Admiral offered to replace the defective copper with new copper.

17. FMI could not risk obtaining replacement copper from Admiral and later learned that the replacement copper was also defective and not oxygen-free.

18. The supposed certified copper was worthless to FMI but to date Admiral has refused to reimburse FMI for the purchase price of the copper.

19. As a result of learning that the copper parts were defective, and in order to meet its contractual obligations with GE, FMI: purchased oxygen-free copper from another supplier, traveling to and from the additional supplier to obtain the material; manufactured replacement clip bodies (2 machines across three shifts a day for 3 days, as well as labor charges for deburring, brite dip of parts and quality inspections); paid Northeast Waterjet a fee for cutting the replacement copper; paying for laboratory testing of six samples; paid for two separate courier fees for the transportation of the replacement parts from FMI in Schenetady, NY to HTG in Cincinnati, OH; paid employees an additional 146 hours for labor; and paid back charges to HTG for the costs for the expedited furnace set-ups and runs.

20. The total value of these activities and expenditures is $40,904.94.

**BREACH OF CONTRACT**

21. The plaintiffs-in-counterclaim repeat and re-allege ¶ 1 through ¶ 20 of their counterclaim and incorporate them herein by this reference.

22. At all times relevant hereto, FMI, Feuz, and Admiral were parties to an agreement whereby Admiral would supply FMI oxygen-free copper, and that Admiral would certify to FMI that its copper was oxygen-free.

23. On June 16, 2003, June 26, 2003, and September 19, 2003, Admiral failed to provide FMI with oxygen-free copper and thereby breached its agreement with FMI.

24. On June 16, 2003, June 26, 2003, and September 19, 2003, FMI relied upon Admiral's representations and certifications that the copper it received from Admiral was oxygen-free.

25. FMI, relying on Admiral's representations and certification that the copper as oxygen-free, used the copper to manufacture stator bar clips and leaf packs, under a contract with GE, which were later determined by GE's field engineers to be defective due to the fact that the copper was not oxygen free as it became brittle after the braze process.

26. As a result of learning that the copper parts were defective, and in order to meet its contractual obligations with GE, FMI: purchased oxygen-free copper from another supplier, traveling to and from the additional supplier to obtain the material; manufactured replacement clip bodies (2 machines across three shifts a day for 3 days, as well as labor charges for deburring, brite dip of parts and quality inspections); paid Northeast Waterjet a fee for cutting the replacement copper; paying for laboratory testing of six samples; paid for two separate courier fees for the transportation of the replacement parts from FMI in Schenetady, NY to HTG in Cincinnati, OH; paid employees an additional 146 hours for labor; and paid back charges to HTG for the costs for the expedited furnace set-ups and runs.

27. FMI has been damaged by Admiral's failure to supply FMI with oxygen-free copper.

28. FMI has been damaged by Admiral's false representations that the copper it supplied to FMI on June 16, 2003, June 26, 2003, and September 19, 2003, was oxygen-free.

29. Had Admiral advised FMI that the copper was not oxygen-free, then FMI would not have used the copper in the manufacture and production of the stator bar clips and leaf packets.

30. Admiral's failure to provide FMI with oxygen-free copper caused FMI to incur damages in the form of purchasing additional materials, production costs, fees from HTG, and damage to FMI's business reputation with HTG and GE.

31. FMI has repeatedly demanded that Admiral remit to or credit on its account its damages caused by the supply and false certification of the copper.

32. Admiral has refused to either remit to or credit FMI's account for FMI's damages.

WHEREFORE, the plaintiffs-in-counterclaim demand judgment against Admiral in the full amount of its damages together with attorney's fees, interest, costs, and such further relief as the Court deems proper.

## COUNT II
## VIOLATION OF M.G.L. c. 93A

33. The plaintiffs-in-counterclaim repeat and re-allege ¶ 1 through ¶ 32 of their counterclaim and incorporate them herein by this reference.

34. Admiral's conduct, as a business that supplies metals, by falsely certifying to FMI that the copper FMI had provided was oxygen-free, and thereafter supplying defective copper to FMI, was an unfair and deceptive act or practice in violation of M.G.L. Chapter 93A, and, further, was unreasonable and done in bad faith.

35. The Massachusetts *Consumer Protection Act*, M.G.L. Chapter 93A, prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce.

36. Admiral's conduct, actions and/or omissions, as discussed *supra*, were undertaken intentionally, willfully, knowingly and in bad faith, and amount to unfair and deceptive acts or practices in violation of M.G.L. Chapter 93A.

37. The plaintiffs-in-counterclaim have suffered damages as the result of Admiral's unfair and deceptive acts and practices and, as such, is therefore entitled to recover damages from Admiral under the provisions of M.G.L. Chapter 93A, including multiple damages, attorneys' fees and costs.

**WHEREFORE**, the plaintiffs-in-counterclaim demand judgment against Admiral in an amount which will afford full and fair compensation in actual and compensatory damages under the provisions of M.G.L. Chapter 93A together with multiple damages, interest, costs, attorneys' fees and all additional relief that this Honorable Court deems just and appropriate nder the circumstances.

## COUNT III
## BREACH OF EXPRESSED WARRANTIES

38. The plaintiffs-in-counterclaim repeat and re-allege ¶ 1 through ¶ 37 of their counterclaim and incorporate them herein by this reference.

39. With respect to each shipment of copper, Admiral made the following expressed warranty: "Chemical and physical analysis for above item attached. This material is free from Mercury and Radium contamination at time of shipment. No weld repair performed. This material will meet all specification requirements listed."

40. The copper Admiral supplied was defective in that it did not meet the requirements set out in the expressed warranty.

41. Admiral therefore breached the expressed warranty, and the plaintiffs-in-counterclaim suffered incidental and consequential damages as a result.

WHEREFORE, the plaintiffs-in-counterclaim demand judgment against Admiral in the full amount of its damages together with attorney's fees, interest, costs, and such further relief as the Court deems proper.

## COUNT IV
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTIBILITY

42. The plaintiffs-in-counterclaim repeat and re-allege ¶ 1 through ¶ 41 of their counterclaim and incorporate them herein by this reference.

43. The copper as provided by Admiral was not or merchantable quality and therefore Admiral breached the implied warranty of merchantability.

44. The plaintiffs-in-counterclaim suffered incidental and consequential damages as a result of this breach.

WHEREFORE, the plaintiffs-in-counterclaim demand judgment against Admiral in the full amount of its damages together with attorney's fees, interest, costs, and such further relief as the Court deems proper.

## COUNT V
## BREACH OF THE IMPLIED WARRANTY OF FITNESS
## FOR A PARTICULAR PURPOSE

45. The plaintiffs-in-counterclaim repeat and re-allege ¶ 1 through ¶ 44 of their counterclaim and incorporate them herein by this reference.

46. Admiral knew the particular purpose for which the plaintiffs-in-counterclaim were to use the copper it supplied.

47. The copper as supplied by Admiral was defective and therefore was unable to meet this particular purpose and therefore Admiral breached the impliedwarranty of fitness for a particular purpose.

48. The plaintiffs-in-counterclaim suffered incidental and consequential damages as a

result of this breach.

WHEREFORE, the plaintiffs-in-counterclaim demand judgment against Admiral in the full amount of its damages together with attorney's fees, interest, costs, and such further relief as the Court deems proper.

## JURY DEMAND

The defendants/plaintiffs-in-counterclaim hereby make claim for a trial by jury as to all issues so triable.

>Respectfully submitted,
>FEUZ MANUFACTURING, INC. and
>GARY A. FEUZ,
>by their attorneys,
>
>/s/ Michael B. Flynn
>Michael B. Flynn          BBO #559023
>Richard A. Davidson, Jr.  BBO #552988
>FLYNN & ASSOCIATES, P.C.
>400 Crown Colony Drive, Suite 200
>Quincy, MA 02169
>(617) 773-5500

DATE: November 8, 2004
G:\F & A\CASE FILES\Feuz Manufacturing\amended cclaim.doc